UNITED STATES of America,
Plaintiff,

v.

Fawzi Mustapha ASSI, Defendant.

No. 98–80695.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 10, 2006.

Robert P. Cares, United States Attorney's Office, Detroit, MI, for Plaintiff.

***OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DECLARE 18 U.S.C. § 2339B UNCONSTITUTIONAL***

ROSEN, District Judge.

Defendant Fawzi Mustapha Assi is charged in a four-count first superseding indictment with (i) providing material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1); (ii) attempted unlawful ex-

port of defense articles—specifically, night vision goggles—without first obtaining the necessary license or written approval, in violation of 22 U.S.C. § 2778; (iii) attempted unlawful export of a controlled article—specifically, a thermal imaging camera—without the proper license or authorization, in violation of 50 U.S.C. § 1705; and (iv) failure to appear at a July 28, 1998 detention hearing in this case, in violation of 18 U.S.C. § 3146(a)(1). Presently before the Court is Defendant's motion challenging the constitutionality of 18 U.S.C. § 2339B, a federal statute which criminalizes the provision of "material support or resources" to any entity designated as a "foreign terrorist organization." Having reviewed the parties' written submissions, and having considered the arguments of counsel at a hearing on this and other matters, the Court now is prepared to rule on Defendant's motion. For the reasons set forth below, the Court finds that the statute in question withstands Defendant's various constitutional challenges.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Count One of the August 25, 2004 first superseding indictment in this case charges Defendant Fawzi Mustapha Assi with knowingly attempting to provide material support or resources to Hizballah, an entity that has been designated by the U.S. Secretary of State as a "foreign terrorist organization." This charge stems from an encounter between Defendant and customs agents on July 13, 1998, when Defendant was preparing to board an in-ternational flight departing from Detroit Metropolitan Airport. Acting upon information that Defendant was planning to transport technical equipment to members of Hizballah in Lebanon,[1] customs agents approached Defendant at the airport and asked to see his passport. An ensuing search of a bag in Defendant's possession allegedly revealed two Boeing global positioning satellite modules, and the agents also allegedly found night vision goggles and a thermal imaging camera in Defendant's luggage. Defendant was questioned and then permitted to leave.

According to the Government's submission in response to Defendant's January 26, 2005 motion to suppress statements, Defendant met with federal law enforcement officials on two occasions in the immediate aftermath of his July 13, 1998 detention at the Detroit airport.[2] During the first of these two interviews, Defendant purportedly explained how he became involved in the procurement of technical equipment. Specifically, he allegedly stated that he was contacted by an individual he knew only as "Hassan," who purportedly sought Defendant's assistance in obtaining aviation equipment, night vision goggles, global positioning satellite systems, thermal imaging infrared scopes, technical software, and bulletproof vests. Defendant allegedly acknowledged his awareness that Hassan sought to purchase this equipment for Hizballah. Defendant also allegedly admitted that he began to provide equipment to Hassan in 1997, that he appreciated the risk involved in this activi-

---

**1.** This information derived in large part from the Government's surveillance of Defendant pursuant to a warrant issued under the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1801 *et seq.* This surveillance is the subject of a separate motion to suppress filed by Defendant.

**2.** Defendant's motion to suppress and the present motion were addressed at the same hearing. The Court agreed to hold the motion to suppress in abeyance, and granted Defendant the opportunity to file a supplemental submission in support of his contention that his statements to federal agents in the days following his initial July 13, 1998 detention were the product of coercion. To date, however, Defendant has not produced any such supplemental filing.

ty, and that he knew that it was illegal. Nonetheless, he purportedly stated that he was willing to help Hizballah in its struggle to expel the Israelis from southern Lebanon.

During his second interview with federal agents, Defendant allegedly identified "Hassan" from a photograph, and again acknowledged his awareness that Hassan was a member of Hizballah. Defendant also allegedly stated that someone other than Hassan had provided him with the names and phone numbers of the American companies from which he was to procure the desired equipment, and he allegedly identified this other individual as being in charge of Hizballah's efforts to develop unmanned surveillance aircraft.

Shortly after his initial detention and these two meetings with federal agents, Defendant appeared at a July 24, 1998 detention hearing, and a magistrate judge determined that he should be released with certain conditions. The Government sought review of this determination by the district court, but Defendant, who had been released in the meantime on an electronic tether, failed to appear for the continuation of the bond review hearing. Instead, Defendant allegedly fled to Lebanon, where he remained a fugitive for nearly six years until he surrendered to U.S. authorities in May of 2004.

A few days after he allegedly fled the country, Defendant was charged in an August 4, 1998 indictment with providing material support to a designated foreign terrorist organization, attempted unlawful export of defense and controlled articles, and failure to appear for a scheduled federal court hearing. Following his return to the United States, Defendant was charged in an August 25, 2004 first superseding indictment with the same four federal offenses.[3] Defendant now seeks the dismissal of Count One of the first superseding indictment, citing various purported constitutional defects in the statute he is charged with violating, 18 U.S.C. § 2339B.

## II. ANALYSIS

Through the present motion, Defendant argues that 18 U.S.C. § 2339B should be invalidated on a number of constitutional grounds. Specifically, he contends: (i) that the statutory prohibition against providing "material support" to an organization designated as a "foreign terrorist organization" ("FTO") impermissibly punishes the exercise of the First Amendment right of freedom of association without requiring the Government to establish a specific intent to further the illegal aims of the organization; (ii) that the statute is overbroad, sweeping a substantial amount of constitutionally protected activity within its definition of criminal conduct; (iii) that § 2339B is impermissibly vague in providing notice of what constitutes illegal "material support" to an FTO; and (iv) that the statute violates due process, the Sixth Amendment right to a jury trial, and separation of powers principles by allowing the Secretary of State to make a purportedly "unassailable" factual determination regarding a material element of the criminal offense set forth in § 2339B—namely, that the organization to which the defendant has provided material support is a "foreign terrorist organization."

---

**3.** The sole change in the first superseding indictment was the addition of a sentencing factor, with the first superseding indictment alleging that the charged offenses are "felonies that involved, or were intended to promote, a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)." (8/25/2004 First Superseding Indictment at 3.)

As discussed below, each of these arguments has been addressed (and largely rejected) in the case law addressing the constitutionality of § 2339B. Consistent with this great weight of authority, the Court finds that the statute passes constitutional muster.

## A. The Statute, Either Facially or as Applied in this Case, Does Not Impermissibly Infringe Upon or Criminalize Protected First Amendment Activity.

As noted earlier, Count One of the first superseding indictment charges Defendant with knowingly providing material support or resources to a foreign terrorist organization ("FTO"), in violation of 18 U.S.C. § 2339B(a)(1). This statute originally was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214. At the time of the conduct at issue here,[4] this statute provided:

> Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 2339B(a)(1) (2000).[5] "Material support or resources," in turn, were defined at the time as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transporta-

tion, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A(b) (2000).[6]

■ As his first challenge to the constitutionality of § 2339B, Defendant argues that the statute impermissibly criminalizes mere association with a group designated as a "foreign terrorist organization," in violation of the First Amendment right of freedom of association. The Supreme Court has observed that the First Amendment "restricts the ability of the State to impose liability on an individual solely because of his association with another," and has explained that this "right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908, 918–19, 102 S.Ct. 3409, 3423, 3428, 73 L.Ed.2d 1215 (1982). In order to avoid impermissible "guilt by association," the Supreme Court has held that liability may not be "imposed by reason of association alone" unless it is "establish[ed]" that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920, 102 S.Ct. at 3429 (footnote omitted).

In Defendant's view, § 2339B runs afoul of this prohibition against "guilt by association." As noted by Defendant, the statute does not demand a showing of specific intent to further the illegal aims of a foreign terrorist organization. Rather, to violate the statute, a defendant need only "knowingly provide[ ] material support or

---

4. As discussed below, the statute recently was amended by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub.L. No. 108–458, 118 Stat. 3638.

5. The maximum term of imprisonment was increased to 15 years in a 2001 amendment, with an increased maximum of life imprison-

ment "if the death of any person results." The most recent 2004 amendments preserve these harsher maximum penalties.

6. This definition also was revised in the recent 2004 legislation, in respects that are not especially relevant to the present inquiry.

resources" to a group designated as an FTO. Presumably, a defendant could knowingly provide such support or resources without intending to advance the illegal aims of the organization, at least so long as the group devotes at least some of its efforts to lawful objectives. In one case addressing the constitutionality of this statutory scheme, for example, the plaintiffs stated that they wished to provide support to certain organizations designated as FTOs, but in ways that would "aid only the nonviolent humanitarian and political activities of the designated organizations." *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir.2000). The plaintiffs in that case, like Defendant here, argued that the statute ran afoul of the rule set forth in *Claiborne Hardware* by "criminaliz[ing] the giving of material support to an organization regardless of whether the donor intends to further the organization's unlawful ends." *Humanitarian Law Project*, 205 F.3d at 1133.

This argument has been uniformly rejected, in *Humanitarian Law Project* and in a number of other appellate decisions. As stated by the Ninth Circuit in rejecting a First Amendment challenge to this statutory scheme:

> Plaintiffs try hard to characterize the statute as imposing guilt by association, which would make it unconstitutional under cases such as *Claiborne Hardware*. But *Claiborne Hardware* and similar cases address situations where people are punished "by reason of association alone," *Claiborne Hardware*, 458 U.S. at 920, 102 S.Ct. 3409, 73 L.Ed.2d 1215—in other words, merely for membership in a group or for espousing its views. AEDPA authorizes no such thing. The statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. Plaintiffs are even free to praise the groups for using terrorism as a means of achieving

their ends. What AEDPA prohibits is the act of giving material support, and there is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions. Nor, of course, is there a right to provide resources with which terrorists can buy weapons and explosives.

> .... Plaintiffs also insist that AEDPA is unconstitutional because it proscribes the giving of material support even if the donor does not have the specific intent to aid in the organization's unlawful purposes. They rely on *American–Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir.1995) (*ADC I*), where we declared that "[t]he government must establish a 'knowing affiliation' and a 'specific intent to further those illegal aims'" in order to punish advocacy. *Id.* at 1063. But advocacy is far different from making donations of material support. Advocacy is always protected under the First Amendment whereas making donations is protected only in certain contexts.... Plaintiffs here do not contend they are prohibited from advocating the goals of the foreign terrorist organizations, espousing their views or even being members of such groups....

> .... Material support given to a terrorist organization can be used to promote the organization's unlawful activities, regardless of donor intent. Once the support is given, the donor has no control over how it is used. We therefore do not agree ... that the First Amendment requires the government to demonstrate a specific intent to aid an organization's illegal activities before attaching liability to the donation of funds.

> .... Plaintiffs make a separate First Amendment argument based on the fact that the terrorist organizations in question also engage in political advocacy.

Pointing to cases such as *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), ... plaintiffs argue that providing money to organizations engaged in political expression is itself both political expression and association. However, the cases equating monetary support with expression involved organizations whose overwhelming function was political advocacy. *Buckley* is the quintessential example where the contributions were made to candidates for political office for the purpose of helping them engage in electioneering. Under those circumstances, money, and the things money can buy, do indeed serve as a proxy for speech and demonstrate one's association with the organization. However, even in *Buckley*, the Court treated limits on donations differently from limits on candidates' expenditures of personal funds. While the First Amendment protects the expressive component of seeking and donating funds, expressive *conduct* receives significantly less protection than pure speech. The government may thus regulate contributions to organizations that engage in lawful—but non-speech related—activities. And it may certainly regulate contributions to organizations performing unlawful or harmful activities, even though such contributions may also express the donor's feelings about the recipient.

Contrary to plaintiffs' argument, the material support restriction here does not warrant strict scrutiny because it is not aimed at interfering with the expressive component of their conduct but at stopping aid to terrorist groups.

*Humanitarian Law Project*, 205 F.3d at 1133–35 (citations and footnotes omitted); *see also United States v. Afshari*, 426 F.3d 1150, 1160 (9th Cir.2005) (rejecting a First Amendment challenge to § 2339B in a case involving financial contributions to the Mujahedin-e Khalq, a designated FTO, and explaining that "[d]onations to designated foreign terrorist organizations are not akin to donations to domestic political parties or candidates"). Upon applying the four-pronged intermediate scrutiny standard set forth in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Ninth Circuit found that the statute did not impermissibly infringe upon the First Amendment freedoms of expression and association. *Humanitarian Law Project*, 205 F.3d at 1135–36.

The Fourth, Seventh, and D.C. Circuits have all reached the same conclusion in cases which, like *Humanitarian Law Project*, concerned financial contributions to organizations designated as FTOs. In *Boim v. Quranic Literacy Institute & Holy Land Foundation for Relief & Development*, 291 F.3d 1000, 1026 (7th Cir. 2002), for example, the Seventh Circuit rejected the contention that § 2339B violates the First Amendment because it imposes liability without regard for whether the donor to a designated FTO "intends to further the unlawful goals of the organization." While recognizing that "[a]dvocacy is always subject to the highest levels of scrutiny under the First Amendment," the Court observed that "donations are not always equivalent to advocacy and are subject to greater government regulation." *Boim*, 291 F.3d at 1026.

Applying this intermediate level of scrutiny to § 2339B, the Seventh Circuit "conclude[d] that the government's interest in preventing terrorism is not only important but paramount," and that this "interest is unrelated to suppressing free expression," but instead "is aimed at prohibiting the funding of violent acts that these organizations wish to carry out." 291 F.3d at 1027. The Court further held that the statute was sufficiently tailored to "avoid unnecessary abridgement of associational freedoms":

Section 2339B forbids the provision of any amount of "material support or resources" to a foreign terrorist organization. "Material support or resources" includes, among other things, money, training, weapons, lethal substances, explosives and personnel. Congress determined that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Pub.L. 104–132, Section 301. Terrorist organizations use funds for illegal activities regardless of the intent of the donor, and Congress thus was compelled to attach liability to all donations to foreign terrorist organizations.... Given the stringent requirements that must be met before a group is designated a foreign terrorist organization, Congress carefully limited its prohibition on funding as narrowly as possible in order to achieve the government's interest in preventing terrorism. We note that Congress did not attach liability for simply joining a terrorist organization or zealously espousing its views. By prohibiting funding alone, Congress employed means closely drawn to avoid unnecessary abridgement of associational freedoms.

291 F.3d at 1027; *see also People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d 1238, 1244 (D.C.Cir. 2003) (quoting *Humanitarian Law Project* with approval in rejecting a First Amendment challenge to § 2339B).

The *en banc* Fourth Circuit recently reached this same conclusion in a criminal case in which the defendant was convicted of violating § 2339B by making a $3,500 donation to Hizballah. *See United States v. Hammoud*, 381 F.3d 316, 328–29 (4th Cir.2004), *vacated on other grounds*, 543 U.S. 1097, 125 S.Ct. 1051, 160 L.Ed.2d 997 (2005), *reinstated in relevant part*, 405 F.3d 1034 (4th Cir.2005). The Court explained that the defendant's First Amend-

ment challenge "fails because § 2339B does not prohibit mere association; it prohibits the *conduct* of providing material support to a designated FTO." *Hammoud*, 381 F.3d at 329. Accordingly, the Fourth Circuit, like the Ninth Circuit in *Humanitarian Law Project*, reviewed the statute under the *O'Brien* intermediate scrutiny standard and found that it readily satisfied all four prongs of this test. 381 F.3d at 329.

The allegations in this case even more clearly highlight the crucial distinction between constitutionally protected expression and association, on the one hand, and conduct that may trigger criminal liability, on the other. In contrast to the facts of the above-cited cases, Defendant here is not accused of making a financial donation that arguably could have been used by the recipient FTO to advance a lawful objective. Rather, the indictment charges that Defendant attempted to provide night vision goggles, global positioning satellite modules, and a thermal imaging camera to Hizballah, a designated FTO. Even assuming that this alleged effort emanated from and reflected Defendant's sincere belief that Hizballah was serving laudable goals, it cannot be denied that the equipment he allegedly sought to provide to this organization was very likely to be used for violent or hostile rather than humanitarian purposes.

To accept Defendant's First Amendment challenge under these facts would invalidate any attempt to outlaw contributions of military hardware or weaponry to any organization, no matter how heinous its actions or abhorrent its mission, so long as the donor could identify some political aim he sought to advance through his donation. The First Amendment does not sweep so broadly in restricting the Government's efforts to fight terrorism. Thus, in accordance with the uniform weight of authori-

ty, the Court rejects Defendant's First Amendment challenge.

## B. Section 2339B Is Not Impermissibly Overbroad.

■■■ Defendant's next contention, closely related to his first, is that § 2339B is unconstitutionally overbroad because it "indiscriminately" criminalizes both protected First Amendment activity and unprotected conduct alike. A statute is overbroad if it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks,* 539 U.S. 113, 118–19, 123 S.Ct. 2191, 2196, 156 L.Ed.2d 148 (2003) (internal quotation marks and citation omitted). As the Supreme Court has cautioned, however, "there are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct." *Hicks,* 539 U.S. at 119, 123 S.Ct. at 2197 (emphasis in original). Accordingly, the Court has "insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the strong medicine of overbreadth invalidation." 539 U.S. at 119–20, 123 S.Ct. at 2197 (internal quotation marks and citations omitted). Indeed, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstration)." 539 U.S. at 124, 123 S.Ct. at 2199; *see also Hammoud,* 381 F.3d at 330 ("[W]hen, as here, a statute is addressed to conduct rather than speech, an overbreadth challenge is less likely to succeed.").

Defendant has failed to demonstrate that § 2339B reaches a substantial amount of protected First Amendment activity. First, to the extent that he construes the statute as "prohibit[ing] any U.S. national from associating with any designated organization to promote any legitimate political, social or religious goal," (Defendant's Motion, Br. in Support at 7), this simply is not a fair reading of § 2339B. As explained above, a person does not run afoul of the statute merely by associating with members of an FTO, becoming a member of the organization, espousing the organization's views, or advocating on behalf of its goals. Rather, one must provide "material support" to an FTO in order to be convicted under § 2339B. This statutory requirement, as the courts have recognized, avoids the concern that an individual might face criminal sanctions for mere association with an FTO. *See, e.g., Hammoud,* 381 F.3d at 329; *Humanitarian Law Project,* 205 F.3d at 1133.

Nonetheless, Defendant points to the Ninth Circuit's recognition in *Humanitarian Law Project,* 205 F.3d at 1137–38, that at least two forms of "material support" as defined in the statute arguably could reach protected First Amendment activity. First, the Ninth Circuit observed that the statutory prohibition against providing "personnel" to an FTO could be construed as encompassing an individual who himself "advocates the cause of" the FTO, "since having an independent advocate frees up members to engage in terrorist activities instead of advocacy." 205 F.3d at 1137. The Ninth Circuit also was concerned that the inclusion of "training" within the definition of material support might implicate protected activity, since an individual "who wishes to instruct members of a designated group on how to petition the United Nations to give aid to their group could plausibly decide that such protected expression falls within the scope of the term 'training.'" 205 F.3d at 1138; *see also Hammoud,* 381 F.3d at 330 (citing *Humanitarian Law Project* in acknowledging that "it may be true that the material

support prohibition of § 2339B encompasses some forms of expression that are entitled to First Amendment protection").

As explained in *Hammoud*, however, such isolated examples do not require the invalidation of the statute in its entirety on overbreadth grounds. Rather, Defendant still must establish that any such overbreadth "is substantial in relation to the legitimate reach of § 2339B." *Hammoud*, 381 F.3d at 330. Defendant has not even attempted such a showing here, beyond citing the Ninth Circuit's limited examples of protected activity that arguably might be encompassed within the statutory definition of material support. Indeed, even these examples were derived from the statutory references to "personnel" and "training," two elements of the definition of material support that are not implicated by the allegations of this case.

Even assuming, then, that the statutory definition of material support might include terms that threaten in a rare case to criminalize protected First Amendment activity, this would not justify the wholesale invalidation of § 2339B in its entirety. To do so would unduly impair the Government's ability to prosecute and punish wholly unprotected conduct, even in cases where this conduct is unquestionably designed and intended to "facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions." *Humanitarian Law Project*, 205 F.3d at 1133. Defendant has failed to persuade the Court that § 2339B sweeps so broadly into areas of protected First Amendment activity and expression to warrant such a drastic remedy.

## C. The Section 2339B Prohibition Against Providing "Material Support" to an FTO Is Not Impermissibly Vague.

Defendant next argues that § 2339B is impermissibly vague in its pro-

hibition against providing "material support" to an FTO. The "void for vagueness" doctrine is founded upon the Fifth Amendment guarantee of due process. *See Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1104 (6th Cir.1995). This doctrine serves two goals. First, it ensures "fair notice to the citizenry," dictating that a law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Columbia Natural Resources*, 58 F.3d at 1104–05 (internal quotation marks and citation omitted). Next, the doctrine aims to "provide standards for enforcement by the police, judges, and juries," seeking to discourage "arbitrary and discriminatory enforcement" by requiring that a law incorporate standards that are "precise enough to avoid involving so many factors of varying effect that neither the person to decide in advance nor the jury after the fact can safely and certainly judge the result." 58 F.3d at 1104–05 (internal quotation marks and citations omitted). "The classification of a federal statute as void for vagueness is a significant matter," and "[e]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality." 58 F.3d at 1105 (internal quotation marks and citations omitted).

Regardless of whether a statutory prohibition against "material support" alone might raise concerns of vagueness, the Government correctly observes that the statutory scheme at issue here provides considerably more guidance, to the citizenry and to law enforcement officials alike, as to what constitutes impermissible "material support" to an FTO. In particular, § 2339B(g)(4) expressly incorporates by reference the definition of "material support or resources" set forth at 18 U.S.C. § 2339A. This provision, in turn, explicitly enumerates the types of "material support or resources" that are prohibited, includ-

ing "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A(b) (2000). In light of this enumerated list of prohibited forms of "material support," the Fourth Circuit in *Hammoud* rejected a vagueness challenge to § 2339B. *See Hammoud*, 381 F.3d at 330.

To be sure, the Court in *Humanitarian Law Project* affirmed the district court's issuance of a preliminary injunction in that case, agreeing that the plaintiffs were likely to succeed on the merits of their claim that the "personnel" and "training" elements of the statutory definition of material support were impermissibly vague. *See Humanitarian Law Project*, 205 F.3d at 1137–38. Not surprisingly, Defendant invites this Court to "follow the Ninth Circuit's reasoning" and broadly invalidate the entirety of the "material support" language of § 2339B as impermissibly vague. (Defendant's Motion, Br. in Support at 8.)

Yet, even the Ninth Circuit itself did not go so far. Instead, it upheld a more limited injunction that barred the prosecution of any of the plaintiff organizations' members for only those activities that were encompassed within the two offending terms, "personnel" and "training." *See Humanitarian Law Project*, 205 F.3d at 1137. As the Fourth Circuit explained in distinguishing the Ninth Circuit's ruling, the "possible vagueness" of the "training" and "personnel" prongs of the statutory definition of material support had no bearing upon the validity of the conviction challenged in that case, "because [the defendant] was specifically charged with providing material support in the form of currency" and "[t]here is nothing at all vague about the term 'currency.'" *Hammoud*,

381 F.3d at 330–31; *see also United States v. Rahman*, 189 F.3d 88, 116 (2d Cir.1999) (rejecting a vagueness challenge because the term identified by the defendant as impermissibly vague was used in a different portion of the statute, and hence was not relevant to his conviction).

So it is here, where Defendant is not accused of providing "personnel" or "training" to an FTO. Rather, the indictment charges that Defendant attempted to provide night vision goggles, global positioning satellite modules, and a thermal imaging camera to Hizballah. As noted by the Government, some of these items, such as the night vision goggles, might well trigger the statutory prohibition against providing "weapons" to an FTO, and the remaining items fall comfortably within the "other physical assets" prong of the statutory definition of material support. While an individual who offers his legitimate services or expertise to an FTO or one of its members in aid of a wholly lawful objective might harbor some doubt as to whether he thereby provides "personnel" or "training," *see Humanitarian Law Project*, 205 F.3d at 1137–38, an individual who furnishes weaponry or equipment with clear military applications can claim no such uncertainty as to whether he has provided "material support" to an FTO within the meaning of § 2339B.

Nonetheless, Defendant asserts that the catchall inclusion of "other physical assets" in the definition of material support adds an impermissible degree of expansiveness to the statute's otherwise specific enumeration of the prohibited forms of material assistance to an FTO. As noted by defense counsel at oral argument, the collected works of Shakespeare presumably would qualify as "physical assets" that could not lawfully be provided to an FTO under § 2339B. Because such a donation seemingly would be unlikely to advance the

unlawful aims of an FTO, Defendant suggests that § 2339B is impermissibly vague in evidently prohibiting such conduct.

 However legitimate this objection to a broad reading of § 2339B, it does not assist in Defendant's effort to establish that the statute is impermissibly vague. To the extent that Defendant seeks to pursue a facial challenge to the vagueness of § 2339B, the Court's "first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Rendon v. Transportation Security Administration*, 424 F.3d 475, 480 (6th Cir.2005) (internal quotation marks and citation omitted). For the reasons explained earlier, the Court already has determined that it does not. Nothing in the statutory reference to "other physical assets" alters this conclusion, as this language does not threaten to reach such protected activities as pure speech, advocacy, or mere association. Accordingly, because § 2339B "does not proscribe a substantial amount of constitutionally protected conduct," Defendant's facial challenge can succeed "only if the enactment is impermissibly vague in *all* of its applications." *Rendon*, 424 F.3d at 480 (internal quotation marks and citations omitted); *see also United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir.2001).

To see why it is not, one need only consider the facts of the present case. As noted, the items that Defendant allegedly sought to furnish to Hizballah clearly fall within the statutory definition of "material support or resources," whether as weapons or as other physical assets. Similarly, the statute could not be viewed as impermissibly vague in cases where the "material support" took the form of, say, false documentation or explosives. Whatever might be said about the possible application of the statute in other hypothetical cases involving more "benign" forms of material assistance, the language of § 2339B is suf-

ficiently clear in prohibiting the activity allegedly engaged in here. This defeats Defendant's facial challenge to the statute, as well as any possible claim that § 2339B is impermissibly vague as applied to him.

Defendant's real objection, at bottom, is that the statute is overly "vague" in a more generalized sense, potentially reaching conduct that cannot plausibly be viewed as advancing the unlawful objectives of an FTO. As the Sixth Circuit has explained, such complaints that a statute is "overly broad" or "brings too much protected activity within its purview" do not suffice to establish that the enactment is "constitutionally deficient on vagueness grounds." *American–Arab Anti–Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 609 (6th Cir.2005). Because the statute is sufficiently specific concerning the sort of conduct set forth in the indictment in this case, it simply does not matter, for present purposes, whether § 2339B threatens to reach other, perhaps more humanitarian forms of assistance. Nor is it necessary, for purposes of resolving Defendant's vagueness challenge, for the Court to consider whether Congress could properly prohibit even wholly "benign" contributions of material support or resources to organizations designated as FTOs. Rather, the Court holds only that the statute neither reaches a substantial amount of constitutionally protected conduct nor is impermissibly vague as applied here.

**D. Section 2339B Is Not Invalid for Lack of an Element of Scienter.**

 As his next ground for challenging the constitutionality of § 2339B, Defendant contends that the statute lacks a necessary element of scienter. The Supreme Court has recognized a "presumption in favor of a scienter requirement," such that a statute should be construed, if possible, as

mandating a showing of *mens rea* as to "each of the statutory elements that criminalize otherwise innocent conduct." *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 72, 115 S.Ct. 464, 469, 130 L.Ed.2d 372 (1994). Defendant argues that the statute at issue here cannot fairly be read as incorporating such a requirement, and hence must be struck down as unconstitutional.[7]

In Defendant's view, § 2339B is most naturally construed as requiring only that an individual must "knowingly" undertake the course of conduct that constitutes "provid[ing] material support" within the meaning of the statute. Alternatively, Defendant submits that the statute could be read as requiring that an individual must provide "material support" with the knowledge that the recipient organization has been designated as an FTO or that it has engaged in the unlawful activities that gave rise to this designation. *See Humanitarian Law Project v. U.S. Department of Justice*, 352 F.3d at 394–405 (adopting this construction of § 2339B).[8] In either event, Defendant argues that the statute does not pass constitutional muster, because it would criminalize conduct that he views as wholly innocent—*e.g.*, the above-cited example of a donation of the complete works of Shakespeare to a school operated by an FTO. Defendant contends that this concern cannot be avoided absent a statutory requirement of specific intent to further the unlawful aims of the organization in question, but he maintains that § 2339B cannot fairly be read as incorporating such a requirement.

Defendant's argument on this point rests on a line of cases beginning with *Scales v. United States*, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), in which the Supreme Court considered the constitutionality of a provision of the Smith Act that prohibited membership in any organization that advocated the overthrow of the United States government by force or violence. In addressing a Fifth Amendment due process challenge to this provision, the Court stated:

> In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity (here advocacy of violent overthrow), that relationship must be sufficiently substantial to satisfy

---

**7.** Defendant has raised this argument in the context of his First Amendment challenge, evidently viewing it as a variation on his contention that § 2339B impermissibly punishes mere association with an FTO. As the Ninth Circuit has observed, however, this First Amendment principle is distinct from the Fifth Amendment due process protection against the imposition of criminal penalties for an individual's mere relationship "by status or conduct" to a proscribed organization, absent proof of the individual's "personal guilt" for the organization's unlawful activities. *Humanitarian Law Project v. U.S. Department of Justice*, 352 F.3d 382, 394 n. 10 (9th Cir.2003) (internal quotation marks and citations omitted), *vacated as superseded by statute*, 393 F.3d 902 (9th Cir.2004). Having previously addressed Defendant's First Amendment argument, the Court now considers his Fifth Amendment due process challenge.

**8.** As noted earlier, § 2339B was amended as part of the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub.L. No. 108–458, 118 Stat. 3638. This amendment added the requirement, similar to the one read into the statute by the Ninth Circuit in *Humanitarian Law Project*, 352 F.3d at 405, that "a person must have knowledge that the organization is a designated terrorist organization ..., that the organization has engaged or engages in terrorist activity ..., or that the organization has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1) (2005). In light of this amendment, the Ninth Circuit vacated its most recent ruling in *Humanitarian Law Project*. *See Humanitarian Law Project*, 393 F.3d at 902.

the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment.

*Scales,* 367 U.S. at 224–25, 81 S.Ct. at 1484. The Court found that the statute survived scrutiny under this standard, as it "reach[ed] only 'active' members having also a guilty knowledge and intent," thereby "prevent[ing] a conviction on what otherwise might be regarded as merely an expression of sympathy with the alleged criminal enterprise, unaccompanied by any significant action in its support or any commitment to undertake such action." 367 U.S. at 228, 81 S.Ct. at 1486.

The Court does not read *Scales* and its progeny as mandating that § 2339B must incorporate the specific intent requirement propounded by Defendant in order to withstand a Fifth Amendment due process challenge. Such a heightened showing of *mens rea* was deemed necessary in *Scales* because the statutory provision at issue otherwise could have been read as prohibiting mere association with, or passive membership in, an organization that pursued illegal objectives. As explained earlier, and as other courts have observed, § 2339B is not such a statute—rather, it criminalizes the affirmative ***conduct of providing material support or resources*** to an organization designated as an FTO. *See Hammoud,* 381 F.3d at 328–29 (distinguishing *Scales* on this ground); *United States v. Paracha,* 2006 WL 12768, at *26–*28 (S.D.N.Y. Jan. 3, 2006) (same); *Humanitarian Law Project v. Gonzales,* 380 F.Supp.2d 1134, 1143–44 (C.D.Cal.2005) (same). Here, for example, the charge against Defendant does not rest upon a mere expression of sympathy for Hizballah's missions or objectives, or upon an effort to join the organization or associate with its members. Instead, the indictment alleges that Defendant affirmatively endeavored to provide material support to this organization, in the form of night vi-

sion goggles, global positioning satellite modules, and a thermal imaging camera.

Nor is Defendant's posited requirement of specific intent necessary to ensure that an individual charged under § 2339B has the requisite "personal guilt" to satisfy Fifth Amendment due process concerns. As explained, the statute prohibits the knowing, affirmative act of providing certain specified forms of "material support" to an FTO. Congress reasonably could have concluded that such "material support" invariably would further the unlawful objectives of the FTO, regardless of the donor's intent or the seemingly "benign" nature of the donor's contribution. Indeed, in enacting § 2339B, Congress reached precisely this conclusion, incorporating into the enactment itself the legislative finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Pub.L. 104–132, § 301(a)(7). Under these circumstances, an individual can appropriately be charged with "personal guilt" for knowingly contributing "material support or resources" to such an organization, and criminal penalties may properly be imposed for knowing conduct that serves to advance the efforts of such an organization, notwithstanding any hope or desire that the "material support or resources" in question will not be used in furtherance of the recipient FTO's illegal activities.

The Court's reasoning on this point comports with the rulings of all but one of the several courts that have considered the nature and constitutional sufficiency of § 2339B's requirement of scienter. In *Paracha,* 2006 WL 12768, at *28, for example, the district court found that the statute satisfied the due process requirement of personal guilt "[b]y criminalizing the conduct of providing material support to

any organization that is properly designated a foreign terrorist organization, and not the mere association with those organizations," thereby "properly focus[ing] on the personal action of the individual." *See also Humanitarian Law Project*, 380 F.Supp.2d at 1148 (holding that § 2339B as recently amended by the IRTPA "satisfies any due process issues under the Fifth Amendment" by requiring that "an offender must know that he or she was materially supporting a foreign terrorist organization," regardless of whether he or she acted with the "specific intent to further terrorist activities").

More generally, these courts have recognized that the additional element of *mens rea* advocated by Defendant here would contravene the clearly expressed intent of Congress without any constitutional basis for doing so. In *Humanitarian Law Project*, 380 F.Supp.2d at 1146, for example, the district court noted that a separate enactment, 18 U.S.C. § 2339A, criminalizes the provision of "material support or resources" with the "know[ledge] or inten[t] that they are to be used in ... carrying out" various violent federal offenses, including acts of terrorism. Yet, the language of § 2339B, enacted just two years after § 2339A, notably lacks any such explicit element of intent to further illegal activities. Because "Congress knows how to include a specific intent requirement when it so desires, as evidenced by § 2339A," the court reasoned that "Congress acted deliberately in excluding such an intent requirement [from] § 2339B." *Humanitarian Law Project*, 380 F.Supp.2d at 1146.

The court found further support for this conclusion in the legislative history of § 2339B:

> [T]he legislative history indicates that Congress enacted § 2339B in order to close a loophole left by § 2339A. Congress, concerned that terrorist organiza-

tions would raise funds "under the cloak of humanitarian or charitable exercise," sought to pass legislation that would "severely restrict the ability of terrorist organizations to raise much needed funds for their terrorist acts within the United States." H.R. Rep. 104–383, at *43 (1995). As § 2339A was limited to donors intending to further the commission of specific federal offenses, Congress passed § 2339B to encompass donors who acted without the intent to further federal crimes.

> In fact, during Congressional hearings on the legislation, representatives from civil liberties, humanitarian, and religious organizations objected to the criminalization of all donations without regard to a donor's intent and a donee's humanitarian deeds.

> Congress, however, rejected these objections in enacting § 2339B. In fact, it made a specific finding that "foreign terrorist organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct."

*Humanitarian Law Project*, 380 F.Supp.2d at 1146 (citations and footnotes omitted); *see also Paracha*, 2006 WL 12768, at *28 ("Section 2339B—enacted two years after section 2339A—plainly excludes the explicit *mens rea* requirement to further illegal activities, and the legislative history indicates that this exclusion was purposeful."); *United States v. Marzook*, 383 F.Supp.2d 1056, 1070 (N.D.Ill. 2005) (holding that to impose a requirement under § 2339B of specific intent to further an FTO's illegal activity would "clash[ ] with Congress's intent," and "thus would contravene the fundamental concepts of statutory construction"). Finally, the court noted that Congress, through the recent enactment of the IRTPA, once

again had the opportunity to incorporate into § 2339B a requirement of specific intent to further illegal activity, but instead elected to "clarif[y] that the only *mens rea* required under § 2339B is that a donor know that the recipient is a foreign terrorist organization." *Humanitarian Law Project*, 380 F.Supp.2d at 1147.

■■■ Nor is there any constitutional ground for insisting that § 2339B must incorporate an additional requirement of scienter that Congress clearly did not intend to include in this enactment. As the Supreme Court has emphasized, "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985). While, as noted earlier, the Court has applied a presumption in favor of a scienter requirement as part of the process of statutory construction, this presumption does not extend to the "judicial rewriting" of a statute to insert this or any other requirement, even where the statute as written might be vulnerable to constitutional attack. *Aptheker v. Secretary of State*, 378 U.S. 500, 515, 84 S.Ct. 1659, 1668–69, 12 L.Ed.2d 992 (1964).

Here, it is evident, and all parties agrees, that § 2339B as written cannot plausibly be construed as mandating a showing of specific intent to further an FTO's illegal activity. It is equally clear that no presumption in favor of a scienter requirement can overcome this brute fact—while the statute requires the "know-ing[ ]" act of providing material support to an FTO, it lacks any language that could be interpreted as requiring a donor's knowledge or intent that the recipient FTO will use the donated "material support or resources" to facilitate illegal activity. Yet, it does not follow that the statute is constitutionally infirm, so long as the showing of scienter that it *does* require is sufficient to meet the due process standard of personal guilt.

The Court already has explained, and other courts have agreed, that § 2339B comports with this constitutional command. In enacting this statute, Congress determined that any knowing contribution of "material support or resources" to an FTO should be forbidden, without regard to the donor's knowledge, desire, or intent as to the use of this donation, because of the inherent propensity of an FTO to use such donations for illegal purposes despite the donor's intentions. "The statutory definition of 'material support [or] resources' limits what constitutes assistance sufficiently blameworthy to attach criminal liability, and courts have not hesitated to dismiss charges founded upon parts of that definition that are constitutionally infirm." *Paracha*, 2006 WL 12768, at *29 (citations omitted); *see also Humanitarian Law Project*, 380 F.Supp.2d at 1148. Consequently, because § 2339B as enacted does not threaten to criminalize otherwise innocent conduct, there is no need to invoke any presumption of scienter or engage in judicial rewriting in order to save the statute from invalidation on Fifth Amendment due process grounds.

To be sure, one district court has reached a contrary conclusion. In *United States v. Al–Arian*, 308 F.Supp.2d 1322, 1339, *reconsideration denied*, 329 F.Supp.2d 1294 (M.D.Fla.2004), the court held that § 2339B raised constitutional concerns that could be avoided only by construing the statute as requiring a showing "that the defendant knew (had a specific intent) that the support would further the illegal activities of a FTO." Such a construction was necessary, in the court's view, to avoid punishing wholly innocent conduct, such as a "cab driver . . . giving a ride to a FTO member to the [United

Nations], if he knows that the person is a member of a FTO or the member or his organization at sometime conducted an unlawful activity in a foreign country." *Al-Arian*, 308 F.Supp.2d at 1337–38.

This Court joins the several other district courts that have found this reasoning unpersuasive. *See, e.g., Paracha*, 2006 WL 12768, at *25, 29; *Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571, 587 & n. 11 (E.D.N.Y.2005); *Marzook*, 383 F.Supp.2d at 1070; *Humanitarian Law Project*, 380 F.Supp.2d at 1147 & n. 15. First, these other courts have observed, and this Court has concurred, that § 2339B cannot be construed as incorporating an element of specific intent to further an FTO's illegal activity without impermissibly rewriting the express language of the statute. *See, e.g., Paracha*, 2006 WL 12768, at *29; *Humanitarian Law Project*, 380 F.Supp.2d at 1146–47 & n. 15.

 More fundamentally, this Court does not believe that the constitutionality of a statute can be made to depend upon one's ability to conjure up a hypothetical scenario in which the statute arguably could be read as criminalizing seemingly innocuous conduct. Just as the court in *Al-Arian* was able to identify a circumstance in which an individual's benign act might be deemed "material support" to an FTO,[9] Defendant here suggests that § 2339B threatens to criminalize contributions to an FTO—*e.g.*, works of literature—that are highly unlikely to further the organization's illegal activity. Yet, as discussed earlier, a successful vagueness or overbreadth challenge requires a showing that a statute threatens on its face to reach a substantial amount of protected conduct, or that the statute as applied in the particular case at hand raises concerns of inadequate notice, infringement upon protected rights, or punishment of innocent conduct. None of these showings has been made here. Thus, the Court need not account for every conceivable application of § 2339B in order to find that it withstands constitutional scrutiny in this case, which features allegations that lie comfortably within the heartland of the conduct that Congress evidently meant to target through this enactment.

In light of this conclusion, and in light of the specific contentions advanced in Defendant's motion, it is not necessary at this juncture to decide which of Defendant's two proposed constructions of the statutory requirement of "knowing[ ]" conduct is correct.[10] It is enough, for present purposes, to conclude that the Fifth Amendment due process standard of "personal guilt" does not mandate that § 2339B include a "specific intent" element or heightened degree of scienter of the sort suggested by Defendant.

---

9. As noted in *Paracha*, 2006 WL 12768, at *29, the specific concern raised in *Al-Arian* seemingly could be avoided by reading § 2339B as requiring a showing that a defendant knowingly provided material support to an FTO, as opposed to merely providing such support to an individual who happened to be a member of an FTO.

10. The Court does note, however, that the case law to date appears to be uniformly in agreement that § 2339B should be construed as requiring knowledge that the organization to which the defendant provided material support was designated as an FTO or had engaged in terrorist activity. *See, e.g., Paracha*, 2006 WL 12768, at *28, 30; *Marzook*, 383 F.Supp.2d at 1069–70. While the Court need not resolve the issue here, it is inclined to agree with the reasoning of these decisions. Moreover, it appears from the present record that the Government would be able to offer proof of this degree of knowledge, in light of Defendant's alleged statement during one of his meetings with federal law enforcement officials that he knew that his efforts to provide equipment to Hizballah were illegal.

## E. Section 2339B Does Not Impermissibly Deprive Defendant of a Jury Determination of Guilt as to Each of the Elements of the Offense Defined by the Statute.

Finally, Defendant argues that there are a number of constitutional infirmities in the method by which an organization is designated as a "foreign terrorist organization," such that contributions of "material support or resources" to such an organization run afoul of § 2339B. Each of these constitutional challenges was rejected in recent appellate decisions, and this Court wholly concurs in the reasoning and rulings of these circuit courts.

 Section 2339B defines a "terrorist organization" as "an organization designated [by the Secretary of State] as a terrorist organization under section 219 of the Immigration and Nationality Act." 18 U.S.C. § 2339B(g)(6) (2000). This latter statute, in turn, provides that "a defendant in a criminal action shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing." 8 U.S.C. § 1189(a)(8). In this case, therefore, Defendant is precluded from challenging the validity of the designation of Hizballah as a "terrorist organization" within the meaning of § 2339B.[11]

 Defendant first argues that this statutory scheme violates his Fifth Amendment right to due process and his Sixth Amendment right to a jury trial by depriving him of a jury determination of guilt as to one of the elements of an offense under § 2339B—namely, that he provided material support or resources to a "foreign terrorist organization." In rejecting this same challenge, the Fourth Circuit stated:

In determining what facts must be proved beyond a reasonable doubt the . . . legislature's definition of the elements of the offense is usually dispositive. . . . Here, Congress has provided that the *fact* of an organization's designation as an FTO is an element of § 2339B, but the *validity* of the designation is not. Therefore, [a defendant's] inability to challenge the designation is not a violation of his constitutional rights.

*Hammoud,* 381 F.3d at 331 (internal quotation marks and citations omitted); *see also Afshari,* 426 F.3d at 1159 ("[T]he element of the crime that the prosecutor must prove in a § 2339B case is the predicate fact that a particular organization *was* designated at the time the material support was given, not whether the government made a correct designation.").

 Nor, as explained by the Ninth Circuit in *Afshari,* is due process violated as a result of Defendant's inability in this proceeding to challenge the validity of Hizballah's designation as an FTO. As observed in *Afshari,* an organization designated by the Secretary of State as an FTO "is entitled to judicial review of the Secretary's action in the United States Court of Appeals for the District of Columbia." *Afshari,* 426 F.3d at 1154 (citing 8 U.S.C. § 1189(c)(1)). Thus, it is simply not true, as asserted by Defendant here, that the challenged statutory scheme in this case "bars courts from reviewing the designation" of Hizballah as an FTO, (Defendant's Motion, Br. in Support at 13)—it merely precludes *this* Court from revisiting this designation in the course of this criminal proceeding. Under these circumstances, where Hizballah has judicial recourse to challenge its designation as an FTO, and

---

11. Hizballah was designated as a foreign terrorist organization in October of 1997, *see* 62 Fed.Reg. 52650 (Oct. 8, 1997), and was redesignated as such in October of 2003, *see* 68 Fed.Reg. 56860, 56861 (Oct. 2, 2003).

where only the fact, and not the validity, of this designation has any bearing upon the offense with which Defendant is charged, "due process does not require another review of the predicate [designation as an FTO] by the court adjudicating the instant § 2339B criminal proceeding." *Afshari,* 426 F.3d at 1159; *see also Hammoud,* 381 F.3d at 331.

 In a related argument, Defendant contends that the statutory scheme violates separation of powers principles by allowing the Executive Branch to make a "finding of fact" that is binding in this proceeding and establishes one of the purported "elements" of a § 2339B offense. As explained, however, neither the Secretary of State's findings that led to the designation of Hizballah as an FTO nor the validity of the resulting designation are "elements" of the § 2339B offense in this case—only the *fact* of this designation must be established. Nor is it constitutionally impermissible for Congress to delegate this designation decision to the Executive Branch, where Congress has established detailed procedures to govern this process and retains the authority to revoke a designation, and where judicial review is available to challenge a designation. *See Afshari,* 426 F.3d at 1154, 1159 (surveying the statutory framework that governs the designation of an organization as an FTO, and upholding this scheme against a constitutional challenge); *Hammoud,* 381 F.3d at 331 (rejecting the argument that this statutory scheme violates the nondelegation doctrine).

Indeed, as observed by the Ninth Circuit, "[t]he sometimes subtle analysis of a foreign organization's political program to determine whether it is indeed a terrorist threat is peculiarly within the expertise of the State Department and the Executive Branch." *Afshari,* 426 F.3d at 1162 (footnote with citation omitted). "Juries"—and judges, this Court might add—"could not make reliable determinations without extensive foreign policy education and the disclosure of classified materials." 426 F.3d at 1162. Accordingly, this Court agrees with the Ninth Circuit that "[t]he Constitution does not forbid Congress from requiring individuals, whether they agree with the Executive Branch determination or not, to refrain from furnishing material assistance to designated terrorist organizations during the period of designation." 426 F.3d at 1162.

 Finally, Defendant suggests that it would violate the principles of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and its progeny to preclude the jury from finding all of the relevant "facts" relating to the designation of Hizballah as an FTO. Again, however, the only "fact" of relevance to the present charge under § 2339B is that Hizballah *was* designated as an FTO during the time period when Defendant allegedly attempted to provide material support or resources to this organization. *See Hammoud,* 381 F.3d at 331 n. 5. So long as the jury makes this finding, along with all other findings dictated by the elements of the offense as defined in § 2339B, Defendant may properly be sentenced within the range set forth in the statute without running afoul of *Apprendi* or its progeny.

### III. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's January 26, 2005 Motion to Declare 18 U.S.C. § 2339B Unconstitutional is DENIED.[12]

---

12. In the event that it might subsequently prove necessary to undertake an analysis of

the pretrial proceedings in this case under the Speedy Trial Act, 18 U.S.C. § 3161, the Court

notes that most or all of the period during which the present motion has remained under advisement would likely be excludable on one or more of the grounds recognized in the Act. As noted earlier, for instance, Defendant has thus far failed to file a supplemental submission in support of his pending motion to suppress, despite the Court's invitation to do so. *See* 18 U.S.C. § 3161(h)(1)(F); *see also United States v. Robertson*, 260 F.3d 500, 503–04 (6th Cir.2001) (stating that "[a] court should exclude all the days during which it is waiting to receive information necessary to decide a pending pre-trial motion"). Moreover, Defendant has filed additional pretrial motions while the present motion remained under advisement, and has stipulated to an extended briefing schedule on these motions. Nonetheless, to the extent that the period while the present motion remained under advisement might not otherwise be excludable under the Speedy Trial Act, the Court finds that a continuance encompassing this period would serve the ends of justice and would outweigh the interests of the public and the defendant in a speedy trial, *see* 18 U.S.C. § 3161(h)(8)(A), where this additional time was necessary to review such recent decisions as *Afshari, Paracha, Marzook*, and *Humanitarian Law Project, supra*, and to give careful thought and proper attention to the several significant constitutional issues Defendant has raised in this relatively new and still developing area of the law. Finally, as to any remaining pretrial proceedings in this case, the Court reminds the Government of its obligation to monitor these proceedings to ensure compliance with the dictates of the Speedy Trial Act.